UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

   -against-　　　　　　　　　　　　　　　　20-Cr-110 (LJL)

LAWRENCE RAY, and
ISABELLA POLLOK,

   Defendants.
------------------------------------------------------X

## MEMORANDUM OF LAW

Defendant Isabella Pollok respectfully submits this motion to suppress all statements she made to law enforcement agents on February 11, 2020. Ms. Pollok was dragged out of bed at gunpoint, held by FBI agents and NYPD detectives,[1] and questioned for six hours. Ms. Pollok was not free to leave. The agents did not give Ms. Pollok any *Miranda* warnings and actively prevented Ms. Pollok from calling a lawyer. These violations of Ms. Pollok's Fifth Amendment rights compel suppression of any statements Ms. Pollok made to law enforcement on this day.

## THE FACTS

At approximately 6:00 a.m. on February 11, 2020, Ms. Pollok awoke to banging and people shouting "FBI." When she opened the door she faced agents

---

[1] For simplicity when referring collectively to the law enforcement officers who participated in the arrest of Mr. Ray, the search of the house and the questioning of Ms. Pollok we refer to them as "agents."

with drawn guns and blinding light from their flashlights. Affidavit of Isabella Pollok, Nov. 19, 2021 ("Pollok Aff.") at ¶ 2. The agents never told Ms. Pollok that she had a right not to answer questions and to have and contact a lawyer before answering questions. *Id.* ¶ 27. Agents questioned Ms. Pollok for six hours, virtually without a break. *Id.* at ¶ 9. Ms. Pollok's impression was that there were more than 20 agents in the house. *Id.* at ¶ 22. They all wore bulletproof vests and carried guns. *Id.* at ¶¶ 23-24. The agents constantly watched over Ms. Pollok. The only time Ms. Pollok could get away from the agents was when she went to the bathroom – although agents escorted her to the bathroom and met her at the door when she finished. *Id.* at ¶ 11. The agents told Ms. Pollok that Mr. Ray was being arrested and that they were searching the house for evidence. *Id.* at ¶ 10. After an FBI agent accused Ms. Pollok of lying, he flung a grand jury subpoena at her and said he was close to arresting her, Ms. Pollok asked to call a lawyer. *Id.* at ¶¶ 16-17. When the agents guarding Ms. Pollok were unsuccessful in their attempts to dissuade Ms. Pollok from calling a lawyer, they resorted to the excuse that they needed a supervisor's approval before she could call a lawyer. Ms. Pollok does not know what communications, if any, were had with the supervisor, but the result was that Ms. Pollok was not able to call a lawyer. *Id.* at ¶¶ 19-20.

Ms. Pollok was terrified. Ms. Pollok did not feel free to leave, and Ms. Pollok was afraid that like Lawrence Ray she too would be arrested before the day was out. *Id.* at ¶¶ 18, 26.

## ARGUMENT

### THE QUESTIONNING OF MS. POLLOK WAS A CUSTODIAL INTERROGATION MADE UNDER COERCIVE CONDITIONS THAT VIOLATED MS. POLLOK'S RIGHTS UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THUS MUST BE SUPPRESSED

In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court made clear that a person in custody must be advised of their rights to remain silent and to have an attorney present before any interrogation can commence. Once a person requests an attorney, "the interrogation must cease" until an attorney is present. *Id.* at 474.

In *Edwards v. Arizona,* 451 U.S. 477, 484 (1981), the Supreme Court held that where a person requests an attorney while being interrogated, all questioning must stop, and the use of subsequent statements violates that person's Fifth Amendment rights. *Accord Michigan v. Mosley,* 423 U.S. 96, 106-107 (1975) (distinguishing procedural safeguards triggered by request to remain silent from requirement that all interrogation must stop if suspect requests an attorney).

In determining whether a person is in "custody" and requires *Miranda* warnings, the Second Circuit has held that

> [T]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focused upon the presence or absence of affirmative indications that the defendant was not free to leave. *An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.*

*United States v. Newton,* 369 F.3d 659, 669 (2004) (citations omitted) (emphasis added).

Custody for purposes of requiring *Miranda* warnings is not necessarily the same as the colloquial understanding of "custody." *United States v. FNU LNU,* 653 F.3d 144, 152 (2d Cir. 2011). To determine whether a person is in custody, a court must look at all the surrounding circumstances. The relevant question is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). The test for determining whether a person is in custody is (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton,* 369 F.3d at 672 (citations omitted). While both elements are required, the second inquiry is the "ultimate inquiry" because the first, the "free to leave" inquiry, shows only that the person was seized. *United States v. Faux*, 828 F.3d 130, 135 (2016) (*citing United States v.*

4

*Newton,* 369 F.3d at 672). When a person believes their detention is not going to be temporary or brief and feels completely at the mercy of the police, they could reasonably believe their detention was comparable to a formal arrest. *Ibid.*

There are six factors to consider in determining whether a person reasonably believed their detention was "not likely to be temporary and brief" and felt completely "at the mercy of police." The six factors are discussed in *United States v. FNU LNU,* 653 F.3d at 153, and are: (1) the interrogation's duration; (2) the location of the interrogation, *e.g.*, in the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers restrained the suspect; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or was under suspicion. *See also United States v. Faux,* 828 F.3d at 135; *United States v. Newton,* 369 F.3d at 675; *Berkemer v. McCarty,* 468 U.S. at 437.

Applying these six factors to Ms. Pollok's interrogation on February 11, 2020, Ms. Pollok could have reasonably believed she was at the mercy of the police and was not free to leave.

1. Agents interrogated Ms. Pollok for six hours. The agents were armed, and their guns were in plain sight. Armed agents, wearing bulletproof vests, swarmed throughout the house, noisily searching for evidence, while other armed agents removed Ms. Pollok from the bedroom, directed Ms. Pollok to keep her hands

visible, and escorted her to the living room. Pollok Aff. At ¶ 4. A female officer immediately started questioning Ms. Pollok without advising Ms. Pollok of her rights or even asking Ms. Pollok whether she would agree to answer questions. Ms. Pollok never volunteered to answer questions. *Id.* at ¶ 5. The questioning continued uninterrupted with only two minimal, escorted bathroom breaks. The agents did not offer Ms. Pollok coffee or food. *Id.* at ¶ 9.

2. The interrogation of Ms. Pollok in the house where she was staying also supports a finding that she was in custody. In *United States v. Craighead,* 539 F.3d 1073 (9th Cir. 2008), the Court found that the defendant's interrogation was custodial where eight officers had created a "police-dominated environment" in the defendant's home.

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he may encounter on the way out.

*Id.* at 1084-85. Here, the house was overrun by at least 20 armed law enforcement officers: some were searching the house, while others were either questioning Ms. Pollok or standing in doorways blocking her from leaving. Agent Serra confirmed Ms. Pollok's belief when he said he was "close to arresting" her and then flung a subpoena at her when he was dissatisfied with her answers.

6

3. The third factor is easily satisfied. Ms. Pollok did not volunteer to answer any questions.

4. Ms. Pollok was not handcuffed or otherwise placed in physical restraints. Nonetheless, at all times, Ms. Pollok was surrounded by agents and officers. Ms. Pollok was not free to move about the home.

5. From beginning to end the agents and officers were armed and wearing tactical vests. The first thing Ms. Pollok saw when she opened the door at 6:00 a.m. was agents with guns drawn. Those guns were constantly visible to Ms. Pollok for the next six hours until the agents left. It is hard to imagine a more chilling and intimidating picture.

6. The final factor is whether the agents told Ms. Pollok she was free to leave or was under suspicion. Special Agent Serra made this clear when he told Ms. Pollok he was close to arresting her. Further, for six hours agents controlled where Ms. Pollok was questioned in the house and blocked her leaving. Ms. Pollok was never left alone. Agents escorted Ms. Pollok to the bathroom.

Perhaps the most egregious part of this horror show was that after Special Agent Serra tossed the grand jury subpoena at Ms. Pollok, she asked to call a lawyer and was stopped from making the call. Ms. Pollok's request was unambiguous, and the agents' response was to position themselves so that they blocked the exit and thereby prevented Ms. Pollok from making any telephone calls.

The interrogation and restraint, the search of the house and the noises made by the agents, terrorized Ms. Pollok. Held in different rooms against her will, not allowed to use the bathroom without an armed escort, surrounded by armed law enforcement agents wearing bulletproof vests, Ms. Pollok could not help but believe she was in custody, her liberty completely curtailed, while her requests to call an attorney and a friend were ignored. Ms. Pollok was never advised of her right to refuse to answer questions, she was never advised of her right to speak with an attorney, and she was actually denied access to counsel during the interrogation.

Under the factors articulated in *FNU LNU v. United States* Ms. Pollok was questioned while in custody for six hours. She was not advised of her rights and forcibly denied the opportunity to call an attorney, despite her explicit request to do so. The agents violated Ms. Pollok's rights under the Fifth Amendment to the United States Constitution. Therefore, any statements Ms. Pollok made to law enforcement on February 11, 2020 must be suppressed.[3]

---

[3] In addition to suppressing Ms. Pollok's statements, any evidence obtained as a result of those statements must also be suppressed as fruits of the poisonous tree. *See Kastigar v. United States,* 406 U.S. 441, 453 (1972) (immunity from the use of compelled testimony and evidence derived therefrom is coextensive with the scope of the Fifth Amendment privilege); *United States v. Allen,* 864 F.3d 63 (2017) (witness' use of defendant's compelled testimony violated defendant's Fifth Amendment right); *Nix v. Williams,* 467 U.S. 431, 442 (1984) ("Fruit of poisonous tree" doctrine not limited to Fourth Amendment violations; doctrine also applies to violations of Fifth and Sixth Amendments). While at this time we cannot know the extent of any evidence obtained from Ms. Pollok's illegally obtained statements, we reserve the right to file appropriate motions at a later date.

## **CONCLUSION**

For the foregoing reasons, Ms. Pollok respectfully requests that this Court issue an Order suppressing her statements on February 11, 2020 to law enforcement officers.

Dated:   New York, New York
         November 19, 2021

                                        Respectfully submitted,

                                        _____
                                        David K. Bertan, Esq.
                                        41 East 11th Street, 11th Floor
                                        New York, NY 10003
                                        (718) 742-1688
                                        dbertan@yahoo.com

                                        Jill R. Shellow, Esq.
                                        80 Broad Street, Suite 1900
                                        New York, NY 10004
                                        (212) 792-4911
                                        jrs@shellowlaw.com

                                        *Counsel for Isabella Pollok*