UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

LAWRENCE RAY,

        Defendant.

No. 20 Cr. 110 (LJL)

# LAWRENCE RAY'S MOTION *IN LIMINE* NO. 2

David E. Patton, Esq.
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Counsel for Lawrence Ray*

**ALLEGRA GLASHAUSSER, ESQ.**
**MARNE L. LENOX, ESQ.**
**PEGGY CROSS-GOLDENBERG, ESQ.**
**NEIL P. KELLY, ESQ.**
*Of counsel*

To: **DAMIAN WILLIAMS, ESQ.**
    United States Attorney
    Southern District of New York
    One St. Andrew's Plaza
    New York, New York 10007

    Attn: **DANIELLE R. SASSOON, ESQ.**
        Assistant United States Attorney
        Southern District of New York

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| BACKGROUND | 1 |
| ARGUMENT | 1 |
| I. Legal Standards | 1 |
| I. The Court should preclude Dr. Hughes from transmitting inadmissible hearsay statements to the jury. | 2 |
| II. The Court should preclude Dr. Hughes from testifying about irrelevant and unduly prejudicial conduct and cases that have no factual connection to this case. | 5 |
| CONCLUSION | 8 |

i

Lawrence Ray respectfully submits this motion *in limine* in advance of trial scheduled for March 8, 2022. Mr. Ray moves the Court for an order precluding the government's proffered expert witness, Dr. Dawn Hughes, from:

1. transmitting inadmissible hearsay statements to the jury; and

2. testifying about victims of sexual abuse scandals—including, but not limited to, those involving the Boy Scouts of America, Catholic Church, USA Gymnastics, NXIVM, and Robert Kelly ("R. Kelly")—that have no factual connection to this case.

## BACKGROUND

On December 6, 2021, Mr. Ray moved to preclude the testimony of the government's proffered expert witness, Dr. Dawn Hughes. Dkt. No. 263 at 26–49; *see* Dkt. No. 275 at 18-32. In its January 11, 2022 Opinion and Order (the "*Daubert* Opinion," Dkt. No. 287), the Court denied Mr. Ray's motion to preclude Dr. Hughes's testimony in its entirety, but reserved decision on the full scope of Dr. Hughes's trial testimony.[1]

## ARGUMENT

### I.  Legal Standards

Pursuant to Federal Rule of Evidence 703, if the facts or data upon which an expert relies in forming her opinion are otherwise inadmissible, the expert may not disclose these facts or data to the jury unless the Court determines that "their probative value in helping the jury evaluate the opinion *substantially* outweighs their prejudicial effect." Fed. R. Evid. 703 (emphasis added); *see also United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990). In contrast to the analysis under Rule 403, Rule 703 "provides a *presumption against disclosure* to the jury of information used as

---

[1] While the defense maintains its previous objections to Dr. Hughes's testimony, it does not intend to re-litigate its *Daubert* motion here. Rather, it seeks to clarify the proper scope of Dr. Hughes's admissible testimony at trial.

the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert." Fed. R. Evid. 703, 2000 Advisory Committee Note (emphasis added). Accordingly, expert testimony that merely recites inadmissible hearsay is improper. *See, e.g.*, *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 720–21 (D. Vt. 2002) (finding expert opinion inadmissible when it "amounts to nothing more than inadmissible 'hearsay in disguise' under Rule 703"), *aff'd* 69 F. App'x 485, 487 (2d Cir. 2003); *see also* Charles A. Wright & Victor J. Gold, 29 FED. PRAC. & PROC. EVID. § 6273 (2d ed. April 2021 Update).

Expert testimony must separately satisfy Rule 403 and may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003).

**I.     The Court should preclude Dr. Hughes from transmitting inadmissible hearsay statements to the jury.**

The Court should preclude testimony from Dr. Hughes that improperly transmits inadmissible hearsay to the jury. As described in detail in Mr. Ray's *Daubert* motion, Dr. Hughes's trial testimony in others matters frequently recounts to the jury the hearsay anecdotes of unidentified victims of interpersonal violence allege abuse by unknown perpetrators; relates how these unidentified victims described their experiences and how they processed these incidents; and reports how these unidentified victims said they felt in these circumstances. *See* Dkt. No. 263 at 36–38 (collecting examples). This testimony frequently repeats statements that Dr. Hughes has heard from her clinical patients. Permitting Dr. Hughes to repeat such hearsay statements to the jury would be improper under Rules 702 and 703, and would violate Mr. Ray's Sixth Amendment confrontation rights and Fifth Amendment due process rights.

2

In its *Daubert* Opinion, the Court declined to exclude Dr. Hughes's testimony because it held that "an expert witness may base opinions on inadmissible facts or data . . . of a type reasonably relied upon by experts in the particular field," including "research methodology . . . that involve[s] listening to the statements of domestic abuse victims, but her testimony will involve the synthesis and interpretation of those statements, rather than the mere conveyance of those statements to the jury." *Daubert* Op. at 24 (quoting *United States v. Torres*, No . 20 Cr. 608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021)).

The fact that Dr. Hughes may *base* her opinions on inadmissible hearsay is not in dispute. *See* Dkt. No. 263 at 33 (noting that "[e]xperts may rely upon otherwise inadmissible facts or data in reaching their conclusions"). The question for this motion *in limine* is whether Dr. Hughes may transmit this inadmissible hearsay to the jury. Pursuant to Rule 702, the answer is no.

In a footnote in its *Daubert* Opinion, the Court appeared to indicate that Dr. Hughes would be permitted to repeat otherwise inadmissible hearsay anecdotes to the jury if, *inter alia*, the probative value of such anecdotes was not substantially outweighed by their prejudicial effect. *Daubert* Op. at 25 n.8. Under Rule 703, however, the standard for admission is the opposite—because these "facts or data" on which Dr. Hughes relies "would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury *only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect*." Fed R. Evid. 703 (quotations omitted).

The government cannot overcome this presumption against disclosure and establish that the probative value of Dr. Hughes's hearsay statements and anecdotes "substantially outweigh" their prejudicial effect. Fed. R. Evid. 703; *id.* 2000 Advisory Committee Note. Dr. Hughes's testimony repeating statements she has heard about why some alleged victims of interpersonal

3

violence felt or acted a certain way in idiosyncratic circumstances could only be offered "as general proof of the truth of the underlying matter," *Daubert* Op. at 25 n.8 (quotations omitted)—*i.e.*, that such alleged victims actually did feel or act a certain way after some event or occurrence—in order to support the opinions Dr. Hughes offered to the jury. The potential prejudice of repeating such anecdotes to the jury is incredibly high. By recounting for the jury stories from unavailable witnesses about their own rapes, sexual assaults, and domestic abuse, Dr. Hughes will inflame the jury and unduly prejudice Mr. Ray by associating him in the jury's mind with these abusers and their conduct.

On the other hand, the probative value of such anecdotes is minimal, if it exists at all, and is certainly not essential to the purported subject matter opinion testimony Dr. Hughes is going to offer based on "her training and on an extensive study of the empirical data and social science literature on sexual assault, interpersonal violence, victimization, coercive control, and trauma." *Daubert* Op. at 24 (quoting government's expert disclosure). The government recognized as much in the very case the Court relied upon in its *Daubert* Opinion. In response to similar concerns about improper hearsay anecdotes being transmitted to the jury in that case,[2] the government agreed not "to elicit specific conversations that [the expert] has had with victims of other domestic violence incidents." *United States v. Torres*, No. 20 Cr. 608 (DLC), Dkt. 67 at 4. Rather, the government conceded that "consistent with Rule 703 and established law on expert testimony, [the expert would] properly testify about coercive control and its impact on victims of

---

[2] It bears emphasizing that the hearsay statements the defense objected to in *Torres* were statements made in connection with structured research interviews conducted using validated social science tools and evaluated in connection with the publication of the proffered expert's peer-reviewed social science literature. Here, if not precluded by the Court, Dr. Hughes will be repeating hearsay anecdotes that her clinical clients have recounted to her, without any further validation or analysis—far from the "type of data reasonably relied upon by experts in the field" in performing academic research. *See* Dkt. 264 at 33–36.

4

domestic violence generally, without impermissibly conveying specific conversations she has had with such victims." *Id.* The Court should order the government and Dr. Hughes to adhere to similar limitations here and not recount hearsay anecdotes and stories from witnesses whom Mr. Ray will not have the opportunity or ability to cross-examine.

Accordingly, consistent with the Court's *Daubert* ruling, Rule 703, and the Fifth and Sixth Amendments, the Court should preclude Dr. Hughes from transmitting inadmissible hearsay statements from unavailable and/or unidentified declarants. *See Daubert* Op. at 24 (allowing Dr. Hughes to provide testimony that "involve[s] the synthesis and interpretation of [hearsay] statements, rather than the mere conveyance of those statements to the jury").

## II. The Court should preclude Dr. Hughes from testifying about irrelevant and unduly prejudicial conduct and cases that have no factual connection to this case.

In his prior motion, Mr. Ray asked the Court to preclude Dr. Hughes's testimony about child sexual abuse, sexual assault, and sexual violence because it did not "fit" the facts of this case, would not be helpful to the jury, and the limited probative value of any such testimony would be substantially outweighed by the risk of undue prejudice to Mr. Ray and juror confusion. *See* Dkt. No. 263 at 43–48; Dkt No. 275 at 29–32. In its *Daubert* Opinion, the Court declined to exclude Dr. Hughes's testimony in its entirety, and deferred resolution on the question of "the extent to which Dr. Hughes may refer to any of her prior cases involving child sexual abuse or instances of violent conduct." *Daubert* Op. at 28.

As described in detail in Mr. Ray's *Daubert* motion, Dr. Hughes's prior testimony reflects that—unless she is precluded from doing so—Dr. Hughes will likely discuss at length notorious sexual abuse scandals involving minors that will be well known to members of the jury, but which are entirely unrelated to the alleged conduct at issue in this case, such as those

5

involving the Boy Scouts of America, USA Gymnastics, and the Catholic Church.[3] But this case does not involve allegations of sexual abuse of minors. The government has conceded as much. *See* Dkt. 265 at 32. As such, any testimony from Dr. Hughes about victims of child sexual abuse would be irrelevant, have no probative value at all, and would not be "helpful" to the jury because it does not "fit" the facts or relate to any issue in the case. *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 402, 403, 702. The government appears to acknowledge as much, representing to the Court that it "does not expect Dr. Hughes to testify about child sex abuse or child molestation" and noting that such topics were not among the opinions disclosed by the government's expert notice. Dkt. 265 at 32.

On the other hand, despite no such allegations in this case, Dr. Hughes's repeated references to these scandals in her testimony would suggest that Mr. Ray is associated with such

---

[3] *See, e.g.*, Tr. 3919:8–19, *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y. Sept. 17, 2021), Dkt. No. 250 ("So, grooming are nonviolent techniques that a child offender would use in order to gain compliance of a child victim and also to assure nondisclosure of the abuse. . . . The child offender would use that and exploit that in order to get access to the child. If it was a Boy Scout leader, it will be I can help you do your Eagle Scout. If it's a gymnastics coach, I will help you get to the Olympics. They will use the vulnerabilities or the interest of the child in order to perpetrate the abuse."); *id.* 3938:7–14 ("Q Have you been involved in cases where the abuse took place in front of others, and the others took no action to assist? A Regrettably, all the time. We just saw in USA Gymnastics, the gymnastics -- because everybody knew about this and nobody did anything. I see that all the time in the Boy Scout cases that I've worked with, in the clergy cases, and other youth sports."); Tr. 3700:2–16, *United States v. Raniere*, No. 18 Cr. 204 (NGG) (E.D.N.Y. June 6, 2019), Dkt. No. 780 ("Q You mentioned peer groups. Do you see these sort of concerns when victims are part of larger communities or institutions? A That's correct. I've seen this in the cases that I've worked on with the Boy Scouts of America, where sometimes in telling about the abuse, then sort of the whole group is going to come down. And, of course, the issue of fearing being believed that somebody who's in high esteem, your Scout Master, could do this to you. I've seen this in the enormous work I've done in the Catholic church and the clergy abuse, that how can I, the victim, be believed and take down a priest? How is that going to work? Now everybody who is involved in my school or my religious instruction or my church and community, that is going to have a ripple effect on that."); *id.* 3702:13–15 ("How can a priest abuse me? How can my Scout leader abuse me? How can my coach abuse me?").

6

acts. This testimony would improperly inflame the jury by describing patterns of abuse perpetrated by other people (not Mr. Ray), encourage the jury to hold Mr. Ray responsible for these other people and their actions, and motivate the jury to find Mr. Ray guilty on an improper basis. As the Advisory Committee warned, such testimony is precisely the type of evidence that would create "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee Note; *see also* 2 WEINSTEIN'S FEDERAL EVIDENCE § 403.04[1][b] ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case. . . . Prejudice is also unfair if the evidence was designed to elicit a response from the jurors that is not justified by the evidence.").

Because any testimony about child sexual abuse and infamous cases involving child sexual abuse allegations would not "fit" the facts of this case or have any probative value, but would introduce a substantial risk of unfair prejudice, confusing the issues, and misleading the jury, such testimony should be precluded. *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702; Fed R. Evid. 403.[4] For the same reasons, the Court should preclude any testimony about the evolution of the research into "coercive control" and similar concepts from studies involving torture victims, prisoners of war, Holocaust survivors, or victims of other notorious systematic abuse wholly unrelated to the allegations at issue here.

---

[4] The same is true of Dr. Hughes's recent involvement in the *Raniere* and *Kelly* trials. Although the defense cannot fathom an argument for why references to Dr. Hughes's testimony in those matters would be relevant or probative in this matter, out of an abundance of caution it moves to preclude any such references at trial, including during any background or "qualification" testimony of Dr. Hughes before the jury. Just as references to infamous child sexual abuse scandals and cases would unfairly prejudice Mr. Ray by associating him with such conduct in the jury's mind, so too would references to Dr. Hughes's involvement in those irrelevant, recent, and highly publicized cases. *See* Fed. R. Evid. 402, 403, 702.

The Court should similarly preclude testimony from Dr. Hughes about rape victims and their victimization. The government has not alleged that this case involves forcible rape. The government has alleged that this case involves other "physical and sex abuse, physical violence, coerced sexual behavior." Tr. 52:10–11, *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Jan. 6, 2022). To the extent any such evidence is introduced at trial, Dr. Hughes's testimony about "the type of conduct that victims of sexual abuse and interpersonal violence have faced and the effect of that conduct on the victims" should be limited to the potential psychological impact of the conduct for which evidence was elicited. *Daubert* Op. at 23.[5] Dr. Hughes should not be permitted to testify about "coercive control" dynamics arising out of entirely different factual scenarios that are not present or even alleged here and that would be unduly prejudicial for Mr. Ray to be associated with in the jury's mind.

## **CONCLUSION**

For these reasons, the Court should preclude the government's proffered expert witness, Dr. Dawn Hughes, from transmitting inadmissible hearsay statements to the jury and testifying about victims of sexual abuse scandals that have no factual connection to this case.

Dated:  January 31, 2022           Respectfully submitted,
        New York, New York

                                   /s/ Marne L. Lenox
                                   Allegra Glashausser, Esq.
                                   Marne L. Lenox, Esq.
                                   Peggy Cross-Goldenberg, Esq.
                                   Neil P. Kelly, Esq.
                                   FEDERAL DEFENDERS OF NEW YORK, INC.
                                   52 Duane Street – 10th Floor
                                   New York, New York 10007
                                   Tel.: (212) 417-8700
                                   Allegra_Glashausser@fd.org

---

[5] Mr. Ray respectfully reserves the right to renew this motion at trial—before Dr. Hughes testifies—so that the Court may appropriately limit any testimony to the acts, behaviors, and circumstances that have a basis in the trial evidence.

Marne_Lenox@fd.org
Peggy_Cross-Goldenberg@fd.org
Neil_Kelly@fd.org

*Counsel for Lawrence Ray*