

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 23, 2022

**BY ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    ***United States v. Lawrence Ray***,
             S2 20 Cr. 110 (LJL)

Dear Judge Liman:

The Government writes to follow up on several pending issues.

**A.  404(b) Evidence**

The Government's Enterprise Letter set forth the potential testimony of three female witnesses, which the Government sought to admit pursuant to Federal Rule of Evidence 404(b). *See* Enterprise Letter at 11. The Government now seeks only to introduce the testimony of Valerie, as evidence of intent, knowledge, and *modus operandi*.

Even where evidence is not admissible as direct evidence, it may be admissible pursuant to Rule 404(b) for certain non-propensity purposes, such as motive, opportunity, intent, and knowledge. Fed. R. Evid. 404(b). This Court "follows an inclusionary approach to the admission of other act evidence," so that "evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999).

Evidence must also satisfy Rule 403, which provides that evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The touchstone of the prejudice analysis is whether the proffered evidence "involve[s] conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

Valerie will testify that she met the defendant in approximately 2004, that they began dating after several months, and that they dated on and off for approximately two years. She will testify that the defendant began to isolate her away from everyone else in her life. In approximately

2005, the defendant began asking Valerie for money, and asked her father to borrow $80,000, which her father gave the defendant.  The defendant would sometimes bring strangers home and instruct her to have sex with them.  Over time, he used these encounters as leverage against her.  He would tell her, in sum and substance, that if she did not do what he wanted, he would never repay her father and that he would disclose her sexual encounters and ruin her life.  On one occasion, Valerie and the defendant got into an argument, and the defendant said he was never going to repay her father and that he was going to destroy her.  Valerie attempted to record the encounter because the defendant had previously tape-recorded their conversations.  When she attempted to do so, the defendant wrapped his arm around her neck, in a choke-hold fashion. After Valerie bit the defendant's arm, he took her cellphone and house phone and prevented her from leaving the house.  He pushed her down on the couch and covered her nose and mouth with a pillow, suffocating her.  He eventually let her go.

This testimony is admissible as evidence of intent, knowledge, and *modus operandi*.  Under Rule 404(b), the Government may offer "other act evidence . . . to show knowledge or intent" when "such evidence is sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (internal quotation marks, alterations, and citations omitted).  The similarities here are striking, and therefore highly probative of knowledge and intent. The defendant's treatment of Valerie bears a marked similarity to his treatment of Felicia and Claudia, including his tactics of isolation and control, use of recordings, demands for money, sexual services to strangers, threats of reputational harm, and violent and demeaning scenarios designed to humiliate his victims.  In addition, as he did to Valerie, the defendant choked Felicia, leaving marks on her neck.  Like Valerie, Claudia will testify that the defendant suffocated her with a pillow (in addition to a plastic bag) and took away her cellphone. The probative value of this evidence is also not outweighed by the danger of unfair prejudice because the conduct is no "more sensational or disturbing" than the charged crimes, *see Roldan-Zapata*, 916 F.2d at 804, which include forced sexual services, sex trafficking, and a violent crime in aid of racketeering that involved suffocating Claudia with a plastic bag while she was tied naked to a chair.[1]  The 404(b) evidence should therefore be admitted.

### B. Petersohn's Maps

Attached for the Court's review and approval is a revised map prepared by cell site expert Andrew Petersohn that is representative of other revisions Mr. Petersohn can implement for the remaining slides.  Petersohn uses a tool called Cell Hawk to map cell site connections. In accordance with the Court's direction, Mr. Petersohn prepared the attached map depicting cell site locations using the smallest graphic available through Cell Hawk, a circle representing approximately 250 feet in diameter. Mr. Petersohn will explain that map representations of cell site locations are not to scale, because cell sites in urban areas are often small panels located on the tops and sides of buildings.  He will further explain that the circular graphic is not intended to show the exact area of coverage.  Instead, it is an aid to indicate the area within which a cell site is located.

---

[1] Valerie informed the Government that after the defendant stopped suffocating her with a pillow, he threatened to shove her head through a shower door and forced her to have sex.  The Government does not intend to elicit this testimony at trial.

There is substantial probative value in providing the jury a graphic illustration of the cell site evidence. For example, Mr. Petersohn will testify that this map illustrates the locations of cell site connections made by Isabella Pollok and Claudia Drury's cellphones on January 11, 2018. Mr. Petersohn will testify that the cell sites to which Isabella Pollok's phone connected on January 11, 2018, at 1:33 p.m. are located within the blue circles, and the cell site to which Claudia Drury's phone connected on January 11, 2018 at 1:32 p.m. and 1:34 p.m. is located within the red circle. The blue and red circles near 35th Street and Park Avenue overlap because Pollok and Drury's devices each accessed the same cell site, for connections approximately 1 minute apart.

Using a graphic to highlight the area around a cell site location is a useful aid to the jury, and the risk of juror confusion or misunderstanding is low, particularly in light of the anticipated testimony that will accompany these slides and the defense's ability to further question Mr. Petersohn about the maps on cross examination. If the Court deems this style map admissible, Mr. Petersohn will revise the remainder of the maps in Government Exhibit 1410 to conform to this representative example.

### C. The Second Circuit's *Zhong* Decision

The Government also writes in response to the defendant's letter, drawing the Court's attention to the Second Circuit's decision in *United States v. Zhong*, No. 19-4110 (2d Cir. February 23, 2022). *See* Dkt. 378. If anything, *Zhong* confirms that Dr. Hughes's testimony is proper and that the defense's repeated objections remain meritless.

Dr. Hughes's proposed testimony does not suffer any of the problems that rendered the expert testimony in *Zhong* improper. As an initial matter, the Second Circuit rejected the notion that forced labor is categorically an improper subject for expert testimony. *Zhong*, No. 19-4110, at 26. The Circuit also favorably cited the Tenth Circuit's decision in *Brinson*, which held that an expert's testimony "could have helped the jury" better understand, *inter alia*, "the relationship between pimps and their prostitutes, . . . how pimps recruit prostitutes, and how pimps control prostitutes." *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014). That conclusion is consistent with the Court's decision to admit Dr. Hughes's testimony here. What crossed the line in *Zhong* was that the expert interpreted the evidence in the case, namely the employment contract at issue, and "provided a detailed analysis" of that contract, "commenting that one clause was 'troubling' and another raised 'major red flags.'" *Zhong*, No. 19-4110, at 28. As the Government has repeatedly made clear, Dr. Hughes will not be opining about the facts of this case or the defendant's conduct, and therefore will not be invading the province of the jury as the expert improperly did in *Zhong*.

The defendant also tries to equate the prejudicial background information offered by the expert in *Zhong* with the relevant examples that Dr. Hughes is expected to describe her testimony. But there is no resemblance. In *Zhong*, the defendant—a "Chinese man who was associated with the Chinese government"—was plainly prejudiced by generalized testimony that the Chinese have a terrible track record with human rights and forced labor and other similar testimony about the abuse of mentally challenged people in China. *Id.* at 29-30. Here, it will be clear that Dr. Hughes's testimony about various studies is relevant because it bears on her expertise about coercive control, but has no direct relation to the defendant and his conduct. There is simply no comparable concern that the testimony will "improperly risk[] prejudicing the jury against" the defendant on the "basis

of his ethnicity and 'guilt by association' with unrelated forced labor in China." (Dkt. 378 at 2 (quoting *Zhong*)).

### D. Obstruction of Justice

Finally, the Government writes to clarify its statements at the February 22, 2022 conference regarding witness tampering and obstruction of justice. Predicate (h) of the racketeering conspiracy charged in Count One refers to acts indictable under 18 U.S.C. § 1512 and 2 (relating to tampering with a witness, victim, or an informant), and predicate (i) refers to acts indictable under 18 U.S.C. § 1503 and 2 (relating to obstruction of justice). With respect to Section 1512:

> In order to prove obstruction of justice in violation of section 1512(c)(2), "the government must show that there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding." *Id*. "[T]he existence of a nexus between [a defendant's] action and the proceeding does not depend on the defendant's knowledge. . . . Rather, the existence of a nexus, for obstruction-of-justice purposes, is determined by whether the defendant's acts have a relationship in time, causation, or logic with the judicial proceedings." *Id.* (internal citations and quotation marks omitted). "[I]n other words, 'the endeavor must have the natural and probable effect of interfering with the due administration of justice.' " *United States v. Reich*, 479 F.3d 179, 185 (2d Cir. 2007) (quoting United States v. Aguilar, 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995)).
>
> Moreover, "[t]he actions of the defendant need not have directly impeded, or attempted to impede directly, the official proceeding." *Martinez*, 862 F.3d at 238. Further, the defendant's actions need not be "successful in impeding or obstructing justice ... so long as his acts had the natural and probable consequence of interfering with an official proceeding that was foreseeable even if not then pending." *Id.* (internal citations omitted). "[A]n official proceeding need not be pending or about to be instituted at the time of the offense[.]" 18 U.S.C. § 1512(f)(1). "Rather, we have found the nexus requirement satisfied where a grand jury proceeding was 'foreseeable' because the defendant was aware 'that he was the target of an investigation.' " *United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015) (quoting *United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011)).

*United States v. Pugh*, 945 F.3d 9, 21-22 (2d Cir. 2019). Here, the evidence surrounding the drafting and publication of the *New York Magazine* article is necessary to complete the story of the defendant's crimes, and also to prove that the defendant conspired to violate Section 1512, because at least as early as the *New York Magazine* investigation, it was foreseeable to the defendant that he would be investigated, and his actions had the nature and probable consequence of interfering with an official proceeding.

Unlike a violation of Section 1512, an offense under Section 1503 requires proof that there was a proceeding pending before a federal court, that the defendant knew of the proceeding, that the defendant threatened a victim, and that the conduct influenced, or endeavored to influence or obstruct, the due administration of justice in the proceeding. *See* 18 U.S.C. § 1503. Here, the Government will argue that the defendant conspired with his father to obstruct justice by

attempting to secure the loyalty of Felicia, including through a threat of force, after he was indicted in this case.

                                      Respectfully submitted,

                                      DAMIAN WILLIAMS
                                      United States Attorney

By: __/s/_____
      Mollie Bracewell
      Danielle R. Sassoon
      Lindsey Keenan
      Assistant United States Attorneys
      Southern District of New York
      (212) 637-2218/1115/1565

cc:     Defense Counsel (by ECF)