

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 6, 2023

**BY ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Isabella Pollok*, 20 Cr. 110 (LJL)

Dear Judge Liman:

    The Government respectfully submits this letter in advance of the February 22, 2023, sentence of Isabella Pollok (the "defendant" or "Pollok"). The Probation Office correctly calculated the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range as 60 months' imprisonment. For the reasons set forth below, the Government submits that a Guidelines sentence is sufficient but no greater than necessary to achieve the purposes of sentencing.

    **I.**    **Offense Conduct**

    The Court is familiar with the offense conduct in this case, having presided over the trial of co-defendant Lawrence Ray. In brief, co-defendant Ray created and led an enterprise that targeted a group of college students and others (the "victims") for indoctrination and criminal exploitation. (PSR ¶ 10). The defendant lived with Ray, her college classmate and Ray's daughter, Talia Ray ("Talia"), and the victims for varying periods of time over the course of a decade. (*Id*.). Ray relied on the participation and assistance of the defendant and his daughter to gain the victims' trust, then subjected the victims to sexual and psychological manipulation and physical abuse, and extracted confessions that the victims had harmed Ray, the defendant, and the various associates and co-conspirators that he sometimes referred to as the Ray Family. (*Id*.). Ray extorted money from his victims, forced some of the victims to perform unpaid manual labor and/or to provide sexual services, including to strangers, and caused victim Claudia Drury to engage in commercial sex acts. (*Id*.).

    As set forth in the Presentence Report, the defendant held a privileged position within the Ray Family, acting as Ray's lieutenant with respect to his extortionate demands for financial payments, physical labor, and prostitution, and in laundering the criminal proceeds of extortion and sex trafficking through bank accounts and GoDaddy. (PSR ¶¶ 10, 14). The defendant was

responsible for managing Ray's finances, enforcing Ray's rules, and making and maintaining recordings of victims' confessions and other damaging collateral.

With respect to the enterprise's finances, the defendant collected thousands of dollars from Santos Rosario. (Tr. 290:1-4). And, over a period of years, the defendant visited Claudia Drury at locations all over Manhattan and New Jersey, to collect thousands of dollars at a clip, many times each week, for a staggering total of millions of dollars. (GX 1634; 1404 at 4-5, 9-10, 15; 1410, 4061; 4064; Tr. 1620:19-23; Tr. 1678; Tr. 1683:4-10). In addition to collecting the proceeds of criminal activity, the defendant maintained ledgers of income and expenses for Ray (GX 1634; 4064; Tr. 1693). She also directed Felicia Rosario's accounting of her own meager expenses on index cards. (GX 4001-03; Tr. 1691:1-4). While collecting money from her abused and trafficked college friends, the defendant was spending luxurious nights at the Pierre Hotel on the Upper East Side and buying expensive clothing, beauty products, and high-end lingerie. (GX 1650 at 7-8). Funds leftover from the defendant and Ray's pricey purchases, their own living expenses, and Talia and Gordon Ray's living expenses in Pinehurst, were laundered by the defendant through bank accounts and GoDaddy. (PSR ¶¶ 36, 38; GX 1405).

With respect to enforcing Ray's rules, the defendant adopted Ray's techniques of interrogation and accusation. In a particularly chilling video introduced at Ray's trial, the defendant chased Felicia Rosario around the house in New Jersey, accusing Felicia of behaving like a criminal, and demanding that she remain in the living room. (GX 4058; Tr. 1612-13). More generally, the defendant carried out Ray's orders to keep the victims in line and in fear. For example, when Felicia Rosario was ordered to remain on the sofa, bound with duct tape and/or zip ties, the defendant was tasked with keeping her in place. (Tr. 1536:6-13). The defendant enforced Ray's severe dietary restrictions on Felicia and Yalitza Rosario, and unlike the victims, she had a key to the locked refrigerators in Pinehurst and New Jersey. (Tr. 1600-02; 2098:5-7). When Daniel Levin was interrogated about his sexuality, and forced to penetrate himself with a dildo, the defendant provided the dildo. (PSR ¶ 16(a)). When Ray brandished a knife at Daniel Levin failed for failing to properly clean the oven in the Upper East Side apartment, the defendant lined the bathroom with plastic, ostensibly to capture the blood from Levin's dismemberment. (Tr. 730:9-23). When Santos and Felicia Rosario were accused of behaving like children, the defendant provided the diapers Ray forced them to wear in front of the group. (Tr. 359:10-17; 1535:15-34).

The defendant also made and maintained recordings of the victims' painful confessions, and Ray's lengthy interrogations. (GX 4176; 4176a; Tr. 315:12-18; 351:5-7). Because of her own privileged position, the defendant herself was not subjected to recorded confessions. (Tr. 315:24-316:1). In addition, the defendant made and maintained recordings of damaging collateral against the victims, including videos of Felicia Rosario engaged in degrading sex acts. The defendant acted as Ray's overseer, ensuring that when Ray commanded Felicia to have sex with a stranger before being allowed to come home, that Felicia did so and that it was recorded. (Tr. 1559:9-24; 1560:20-22 ("He would send Isabella with me to make sure that we actually got the video the way he wanted it")). The recordings make plain that the defendant participated in some of Ray's worst abuses. For example, when Ray threatened Santos Rosario with prison, the defendant reminded Santos that Ted Bundy "was electrocuted" for his crimes. (GX 4175 at 14:35). While Ray beat a confession out of Santos, the defendant played purportedly corroborative recordings of Santos's other confessions. (GX 4176a at 13:15; Tr. 315:6-11). During the same interrogation, when Ray needed

further instruments of torture, the defendant got a hammer that Ray used to hit Santos (Tr. 313:6-14), and she reminded Ray that he also had a "razor knife" in his backpack (GX 4176a at 19:20-38; Tr. 317:10-11).

Among the defendant's most egregious conduct was her participation in the hours-long torture of Claudia Drury at the Gregory Hotel in October 2018 (Tr. 1041:17-19). The defendant called Claudia a "faker" when Claudia cried while being doused in water while tied naked to a chair. (Tr. 1037). The defendant handed Ray the plastic bag used to suffocate Claudia. (GX 1709 ("LARRY: Pass me the bags, hey. [UI] Isabella: Okay")). And she enjoyed cheeseburgers, mozzarella sticks, and chicken fingers ordered in for delivery while Claudia was suffering unspeakable terror. (GX 1650). After participating in this horrific demonstration of Ray's abuse, the defendant doubled down on her commitment to Ray. Having helped Claudia make internet advertisements for prostitution (Tr. 1620:8-16), the defendant was angry when Claudia stopped turning over the proceeds of her commercial sex work. (Tr. 1702). She was "excited" and "gleeful" when describing Claudia's agony during the assault at the Gregory Hotel to Felicia the following day. (Tr. 1684-85). And when the assault proved effective at getting Claudia immediately back to work for the Ray enterprise, it was the defendant who returned to Claudia's hotel hours later to pick up sex trafficking proceeds.

After the assault, the defendant was also responsible for curating some of the most hateful and harmful content posted on the website Ray created to blackmail Claudia. Documents recovered from the defendant and Ray's residence show handwritten notes by the defendant with additions for the Claudia website, including excerpts from the recording of the Gregory Hotel assault (GX 1634 at 13), and a list of things that would inflict maximum emotional distress on Claudia, and which in fact did inflict such harm (GX 1634 at 17 (listing Stuart Piltch, clients, binge eating, hurting people for mother's approval, ways Claudia tried to evade responsibility for poisoning, and evidence of poisoning); *see* GX 1634 at 32 (listing things Claudia "would not want to go on website," and which were then included on the website)).

After New York Magazine published a feature article about Ray, the defendant and Ray contacted Claudia directly and made threatening and intimidating comments. (PSR ¶ 42). The defendant, Ray, and Talia exchanged at least fifteen versions of an email designed to threaten and shame Claudia. (GX 1640; 3473). Drafts of the email were recovered from the defendant and Ray's residence that showed the defendant made handwritten edits to the email, which accused Claudia of "evil" actions, told her that she belonged in prison, and called her a "fat, lonely nobody" and a "criminal" who would end up in a "jumpsuit." (GX 1634 at 51-57). The defendant and Ray also contacted Santos Rosario, in an effort to get him to post a false defense of Ray online. (GX 1902; Tr. 362). Through these actions, and others, the defendant and Ray obstructed justice, tried to silence and control their victims, and sought to evade detection and responsibility for their crimes.

## II. Plea and Applicable Guidelines Range

Pursuant to the plea agreement, dated August 22, 2022, the defendant pleaded guilty to a one-count superseding information (the "Information"), charging her with a conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371,

specifically, participating in a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956. This offense has a statutory maximum sentence of five years' imprisonment.

The plea agreement provides that U.S.S.G. § 2X1.1 applies to the offense, and because the substantive underlying offense is money laundering, U.S.S.G. § 2S1.1 applies. Pursuant to U.S.S.G. U.S.S.G. § 2S1.1(a)(1), the applicable offense level is the offense level for the offense from which the laundered funds were derived: extortion and sex trafficking by force, fraud, and coercion. Pursuant to Application Note 3 of U.S.S.G. § 1B1.5, the offense with the most serious offense level governs, here, sex trafficking. The guideline applicable to sex trafficking is U.S.S.G. § 2G1.1. Pursuant to U.S.S.G. § 2G1.1(a)(1), the offense level is 34. Pursuant to U.S.S.G. § 3E1.1(a) and (b), a three-level reduction is warranted for acceptance of responsibility, resulting in an adjusted offense level of 31.

Because the defendant is in Criminal History Category I, the agreement provides that the Guidelines Range would be 108 to 135 months' imprisonment. However, because the authorized maximum sentence is 60 months' imprisonment, pursuant to U.S.S.G. § 5G1.1(a), the applicable Guidelines range is 60 months' imprisonment. The United States Probation Office calculated the same Guidelines (PSR ¶¶ 52-62, 112), and recommends a below-Guidelines sentence of six month's imprisonment. (PSR at 28).

### III.     Discussion

#### 1. Applicable Law

In addition to the Guidelines, which are not mandatory but must be consulted prior to sentencing, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. The Section 3553(a) Factors Support a Guidelines Sentence

#### i. The Nature and Circumstances of Offense Support a Guidelines Sentence

For the better part of a decade, the defendant participated in a sustained and lengthy criminal scheme that saw the futures and fortunes of multiple victims decimated. The seriousness of the offense conduct is impossible to understate, and the defendant's role in the offense conduct was secondary only to Ray's, the enterprise's leader. The defendant was integral to Ray's scheme. While her college friends and roommates, and their families, suffered physically, sexually, emotionally, and financially, the defendant acted as the recorder, enforcer, and treasurer. She actively participated in the sex trafficking of Claudia Drury, whom she derided in text messages with Talia Ray. (GX 4063). The extensive documentary evidence in this case bears no indication of remorse, ambivalence, guilt, or horror on the part of defendant for her role in the victimization of her former roommates and friends, even after she witnessed and assisted in the suffocation of Claudia at the Gregory Hotel. Instead, the defendant picked up Claudia's sex trafficking proceeds just hours after the Gregory Hotel assault, curated hateful online content pointedly designed to wound Claudia, and drafted hateful invectives meant to silence Claudia from exposing Ray and the defendant. The defendant's actions had serious consequences on others, and those consequences should be considered in determining her sentence. *See*, *e.g.*, *United States v. Brass*, 527 F. App'x 70, 72-73 (2d Cir. 2013) (affirming above-Guidelines sentence where victims suffered an "extraordinary degree of harm"); *United States v. Kaye*, 23 F.3d 50, 53 (2d Cir. 1994) (affirming upward departure where guidelines did not capture degree of harm or consequences from criminal conduct).

Because of the significance of her role, the independent actions she undertook, and the egregiousness of her conduct, the Government respectfully submits that a substantial sentence of incarceration is necessary. The defendant collected, laundered, and lavishly spent profits from extortion and sex trafficking schemes, participated in Ray's use of physical violence against others, bullied and emotionally manipulated victims in service of the extortion and trafficking schemes, and acted as Ray's surrogate with respect to the sex trafficking of Claudia Drury. These facts demand a Guidelines sentence to adequately reflect the seriousness of the offense and the need to deter the defendant, who does not appear to have fully disavowed her conduct, and others from engaging in this kind of horrific abuse.

#### ii. The Defendant's History and Characteristics Support a Guidelines Sentence

The Government does not dispute that the defendant also suffered at Ray's hands. Witness interviews and evidence recovered during the investigation show parallels between the defendant's experience and that of the victims in this case. The defendant was in college when she was introduced to the defendant through her trusted friend Talia. As he did with his victims, Ray initially presented himself to the defendant as someone who could "help" her and he became a trusted mentor. She moved into the Upper East Side apartment, lived with Ray, and attended school while remaining at a distance from the Sarah Lawrence campus. The defendant was young, impressionable, and struggling with mental health issues when Ray entered into her life.

From the beginning, however, the defendant's relationship with both Ray and Talia was unique within the group. For example, in the Upper East Side apartment where the group resided, the defendant commonly slept in the bedroom with Ray while everyone else slept on shared couches and blow-up mattresses. While the other victims were interrogated and punished, the defendant occupied a privileged position that insulated her from similar abuse. While the Government recovered dozens of audio and video confessions for victims like Claudia and Santos in its investigation, the Government did not identify any recorded interrogation or confession of the defendant. To the contrary, as detailed above, the Government identified numerous instances where Pollok participated in the victims' interrogations – with mockery, laughter, or threats – or recorded others' interrogations in video or audio format.

Though Ray routinely used striking violence against the other victims, the Government is aware of one recording showing violence against the defendant in the New Jersey residence, which metadata shows was recorded on August 16, 2018. As the defendant tried to enter the residence, Ray responded in part, "you didn't get your way before, what makes you think you're getting it now," and then grabbed the defendant's hair, shaking her head forcefully. In addition, the Government credits that the defendant was herself sexually groomed by Ray, just as the defendant groomed Felicia and Claudia, and that this grooming began early in their relationship. For example, Daniel Levin has described that Ray guided Levin and the defendant to engage in various sexual encounters with each other in the summer of 2011. In addition, the Government recovered videos depicting the defendant engaged in graphic and degrading sexual acts at Ray's instruction. As Claudia testified, on several occasions, she engaged in sexual acts with the defendant at Ray's direction, and while Ray observed. Ray and the defendant were, at the same time, in a sexual relationship with each other, which continued at least until Ray's arrest. Recorded jail calls suggest that, after his arrest, Ray was communicating messages to the defendant through his father, describing her as special, and promising to marry her.

In the Government's view, however, the defendant's guilty plea to a crime with a five-year statutory maximum—rather than to the many other serious crimes in which she engaged, including racketeering conspiracy, extortion conspiracy, sex trafficking conspiracy, and money laundering— fully and appropriately accounts for the defendant's mitigating circumstances, which do not justify a further reduced sentence in light of the seriousness of the defendant's crimes. There is a stark dividing line between the defendant and the individuals identified as victims in this case. The defendant repeatedly and remorselessly participated in the abuse of others and benefitted financially from her role in victimizing Claudia. The defendant mirrored the tactics that Ray used, undertaking and participating in the victimization of others.

Unique among the Sarah Lawrence students who had the misfortune of entering Ray's orbit, the defendant took the opportunity to enjoy the privileges of her elevated status. Rather than turn inward like the victims, who suffered in extreme isolation, the defendant turned outward and inflicted pain and suffering on others. Rather than leave, like Daniel Levin, the defendant stayed and enjoyed the benefits of her favored position. The defendant's actions enabled Ray to maintain his position at the head of the Ray Family, assisted Ray in ensuring that the victims were kept in fear, and safeguarded the fortune that Ray extorted and extracted.

While the defendant has been able to compartmentalize her past enough to maintain a job and a romantic relationship, the destructive impact and consequences of the defendant's conduct are borne by the victims to this day. Unlike the defendant, Santos Rosario did not complete his education. Unlike the defendant, Claudia Drury has struggled to maintain a job. Unlike the defendant, the victims have not simply picked up the pieces to create new and productive lives for themselves. While the defendant's ability to move on may be a measure of her own resiliency and growth, it is also a measure of the privilege she enjoyed as Ray's favored lieutenant.

The defendant's entire experience, both the suffering she endured and inflicted, was seriously considered by the Government in determining an appropriate plea disposition and animated the Government's plea offer in this case. The Government agrees that the mitigating circumstances identified by the defendant should be considered by the Court in determining an appropriate sentence. Nonetheless, the defendant's central role in Ray's brutal exploitation must also be considered. Indeed, even now, it is not clear that the defendant has fully separated from the viewpoint that animated the Ray enterprise – blaming their victims for damages and then demanding endless compensation. Her submission does not make clear whether she continues to believe she was poisoned, as she and Ray justified their exploitation at the time, and whether she continues to believe the victims harmed her in some way during the decade of time she joined in their exploitation.

### iii. The Need for the Sentence to Deter Criminal Conduct Is a Significant Consideration

Contrary to defense counsel's assertion, deterrence is a significant consideration in this case. It is entirely unclear how a term of incarceration would "cause other victims to fail to seek help from law enforcement." (Def. Ltr. at 9). The victims in this case did seek help from law enforcement. The defendant did not, and she should not be rewarded for her indifference at every stage of the prosecution to bringing Ray to justice. Indeed, the defendant actively joined in Ray's efforts to assemble leverage against the victims should they try to go to the authorities or stop paying "damages." An incarceratory sentence will send a message that those who aid in victimizing others, facilitate trafficking offenses, and launder crime proceeds will face punishment when they are caught. It will also send a message that a power imbalance between coconspirators does not provide cover to commit heinous crimes against others. General deterrence is particularly important given the difficulty of rooting out crimes that employ such extensive tactics of coercive control with efforts to intimidate and deter reports to law enforcement.

### iv. The Need to Avoid Unwarranted Sentencing Disparities Supports a Guidelines Sentence

A substantial sentence is needed to avoid unwarranted sentencing disparities with similarly-situated defendants. The Government submits the sentences imposed on the deputies and associates of Keith Raniere in *United States v. Keith Raniere*, 18 Cr. 204 (E.D.N.Y.) are a relevant analogue. In that case, Alison Mack, who pleaded guilty to racketeering and participating in a racketeering conspiracy, and assisted the Government in its prosecution, including by providing evidence against Raniere, was sentenced to 36 months' imprisonment. Nancy Salzman, who pleaded guilty to participating in a racketeering conspiracy, and assisted the Government in its

prosecution, was sentenced to 42 months' imprisonment. Only Lauren Salzman, who actually testified against Raniere, received a non-incarceratory sentence. On the other hand, Clare Bronfman, who pleaded guilty to a conspiracy to conceal, harbor, and shield from detection, one or more aliens, and to transferring and using the identification of others in connection with attempted tax evasion, and did not assist the Government in its prosecution, was sentenced to an above-guidelines sentence of 81 months' imprisonment. These sentences reflect the fact that these individuals were willing lieutenants who carried out their leader's criminal scheme. Like Bronfman, the defendant played a prominent role in the criminal scheme and is not entitled to credit for assisting in the Government's prosecution.

### 3. Defense Counsel's Request for a Non-Incarceratory Sentence Should be Rejected

Defense counsel's argument that justice demands a non-incarceratory sentence should be rejected. Defense counsel's argument that "if it were not for Lawrence Ray," the defendant would not be here (Def. Ltr. at 1), is of course technically correct. But the same is true in every case where a co-conspirator plays a leadership role, and taking the argument to its logical conclusion, the same is true of almost every defendant in almost every case. With different opportunities, experiences, and choices, very few defendants would turn to a life of crime, let alone crimes that inflict physical pain and suffering on others. The Probation Office also weighed Ray's apparent influence over the defendant heavily in recommending a six-month sentence of incarceration – citing the nature of the defendant's relationship with Ray, among other factors, to recommend a substantial downward variance. (PSR at 30 ("[W]e cannot overlook the likelihood that Ray had great influence over Pollok during their decade-long relationship, and how that would presumably impact her decision in becoming involved in the offense.")). This argument, advanced by defense counsel and echoed by the Probation Office, understates the defendant's culpability, the nature of her involvement in the extortion and sex trafficking, and the damage she individually inflicted on the victims.

Far from being aberrational, the defendant's conduct was sustained over multiple years, impacted multiple victims, and took place in multiple jurisdictions. And the notion that but for Lawrence Ray the defendant would be leading a law-abiding life is an improvable counterfactual. It also does not grapple with the substantial ways the defendant differed from the victims in this case, who suffered tremendous abuse but never inflicted harm on each other. The victims were subject to Ray's influence and nonetheless refrained from active harm even when Ray prodded them to join in interrogations or make accusations against each other. To attribute the defendant's conduct solely to Ray is to ignore the agency reflected in the defendant's decision to remain with Ray, to harm others, and to profit from this harm over a period of years.

The defense describes the two "tracks" deployed by Ray, one for the victims and one for the defendant. But this was not mere happenstance—Ray tapped the defendant to act as his lieutenant because she exhibited a capacity and willingness to carry out his directives. Indeed, the defendant willingly satisfied the role Ray bestowed upon her, assisting the defendant year after year, enabling his abuse, laundering his criminal proceeds, and covering up his crimes, while showing no trace of remorse for her actions or compassion for the victims. Though Ray encouraged group participation in the interrogations, only the defendant and Talia assumed an active role in victimizing others. While Ray used tactics of coercive control, he did not eliminate

anyone's free will, agency, or moral responsibility—the defendant must be held accountable for her decision to work alongside Ray as his coconspirator and lieutenant in a long-running and appalling criminal enterprise.

### IV. Forfeiture and Restitution

As the Court is aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve important governmental interests such as separating a criminal from ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic power of criminal enterprises." *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (citation and internal quotation marks omitted). The Government is seeking to negotiate a forfeiture money judgment with the defense prior to sentencing, which will be submitted for the Court's consideration under separate cover. The Government expects to submit its proposed order of forfeiture no later than February 15, 2023.

With respect to restitution, the Mandatory Victim Restitution Act of 1996 ("MVRA") requires that defendants convicted of certain crimes, including crimes of violence or offenses against property that cause a "physical injury or pecuniary loss" to "an identifiable victim," "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c). Under the MVRA, victims of offenses "resulting in bodily injury" are entitled to recover the costs of medical care and "related professional services" relating to mental health care, the costs of "necessary physical and occupational therapy and rehabilitation," and lost income that resulted from the offense. *Id*. § 3663A(b)(2). The Government is also conferring with defense counsel and will submit any proposed restitution order by the same date.

### V. Conclusion

The defendant's participation in a lengthy scheme of abusive criminal conduct requires a substantial sentence of imprisonment. A Guidelines sentence is consistent with sentences imposed against individuals in comparable schemes with comparable roles. A non-incarceratory sentence or a dramatically low sentence like the 6 months recommended by Probation fails to satisfy any of the principal purposes of sentencing. Thus, the Government respectfully requests that the Court impose a Guidelines sentence, as such a sentence would be sufficient but not greater than necessary

to serve the legitimate purposes of sentencing.

                Respectfully submitted,

                DAMIAN WILLIAMS
                United States Attorney


By:  /s/ _____
     Lindsey Keenan
     Mollie Bracewell
     Danielle R. Sassoon
     Assistant United States Attorneys
     (212) 637-1565/2218/1115

cc:    defense counsel (by ECF and E-mail)